1  David A. Tilem (Bar No. 103825)
   LAW OFFICES OF DAVID A. TILEM
2  206 North Jackson Street, Suite 201
   Glendale, California 91206
3  Tel: 818-507-6000  Fax: 818-507-6800
   Email: DavidTilem@TilemLaw.com
4
   Stephan A. Mills, (Bar No. 94166)
5  ZEMANEK & MILLS
   11845 W. Olympic Blvd., Suite 625
6  Los Angeles, California 90064-5020
   Tel: 310-473-8100 Fax: 310-445-3166
7
   Attorneys for Creditor Jason Rubin, as Co-Trustee
8  of the Cira Ross Qualified Domestic Trust

9

10              **UNITED STATES BANKRUPTCY COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                  **LOS ANGELES DIVISION**

13  In re:                          )
                                    )  **Case No. 2:09-bk-10720-SB**
14  **DAVID LEONARD ROSS,**          )
                                    )  **Chapter 7**
15              Debtor.             )
                                    )
16  _____    )
    **JASON RUBIN, AS CO-TRUSTEE**   )  **Adv No.2:09-02063-SB**
17  **OF THE CIRA ROSS QUALIFIED**   )
    **DOMESTIC TRUST,**              )  **FIRST AMENDED COMPLAINT TO**
18                                  )  **DETERMINE ENTITLEMENT TO**
                                    )  **DISCHARGE AND DISCHARGEABILITY**
19              Plaintiff,          )  **OF DEBTS**
                                    )
20      v.                          )  Status Conference Hearing:
                                    )  Date:     TBD
21  **DAVID LEONARD ROSS,**          )  Time:
                                    )  Ctrm:
22              Defendant.          )
    _____    )

23      Plaintiff JASON RUBIN ("Rubin") as Co-Trustee of the Cira Ross

24  Qualified Domestic Trust ("the Trust"), alleges and states as

25  follows:

26                  **INTRODUCTORY ALLEGATIONS**

27      1.  This adversary action is filed in the above-referenced

28  Chapter 7 proceeding commenced voluntarily by Debtor David Ross

("Debtor") on January 13, 2009 ("the Filing Date").

2.   This is an action to determine whether certain claims are not dischargeable pursuant to various sub-parts of 11 U.S.C. §523(a).

3.   This complaint also seeks a determination whether the Debtor should be entitled to a discharge pursuant to various sub-parts of 11 U.S.C. §727(a).

4.   The Court has jurisdiction to consider the within action pursuant to 28 U.S.C. §§ 1334, 157(a) and the Order of Reference from the United States District Court for the Central District of California.

5.   This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J) as to which the Court may render Judgment.

6.   Venue is proper pursuant to 28 U.S.C. § 1409(a).

7.   Pursuant to an Order of the Court entered August 28, 2009, the last date to file a complaint under 11 U.S.C. §§ 523 or 727 was August 31, 2009.  This action was filed on or before that date.

### BACKGROUND FACTS

8.   Ysaac Ross ("Ysaac") and Cira Ross ("Cira") were husband and wife for more than 50 years until Ysaac passed away on January 11, 2001.

9.   Ysaac left a sizeable estate ("the Probate Estate"), in the sum of approximately $40,000,000.

10.   Following Ysaac's death, a state court probate action was initiated in Riverside County Superior Court (Case No. INP 017504) ("the Probate Case").

11.   In or about 2001, Cira filed a petition in the Probate Case seeking a Family Allowance from the Probate Estate.  Debtor

1  unsuccessfully opposed her petition on the alleged ground that she

2  and Ysaac had never married.

3      12.  In or about 2001, Cira filed a Spousal Property Petition

4  in the Probate Case seeking a judicial determination that the

5  Probate Estate consisted entirely of community property, that

6  therefore she was entitled to one-half of the Probate Estate as her

7  community property and that hence she was entitled to that portion

8  of Ysaac's community property that was not disposed of by his will.

9  Debtor opposed the aforesaid petition.

10     13.  Among other things, Debtor and four relatives sent a

11 letter to Cira, dated September 21, 2001, which stated that, unless

12 Cira agreed to give one-half of the Probate Estate to fourteen

13 members of Ysaac's side of the family, which included Debtor, they

14 would be "forced to argue that [Cira] must pay a large sum of money

15 in taxes by October 1.  If that happens no one will benefit and

16 everyone will lose.  Please do not let this happen we know Ysaac

17 would never have allowed this."  A true and correct copy of the

18 aforesaid letter is attached hereto as Exhibit A.

19     14.  Debtor's September 21, 2001 letter to Cira also stated

20 that "it seems to us that the only ones who will come out with any

21 money will be the lawyers unless we can get this matter settled."

22 In addition to opposing Cira's Family Allowance and Spousal

23 Property petitions, Debtor took actions with respect to the Probate

24 Case intended to substantially and vexatiously increase the legal

25 fees incurred by the Probate Estate and by Cira.

26     15.  On or about September 26, 2001, Debtor sent a letter to

27 to Merrill Lynch stating, among other times, that "[w]e have

28 offered on numerous occasions to stipulate to [the Spousal Property

1    Petition] in exchange for a settlement for Ysaac's relatives," and

2    that, unless "we can reach a settlement we must vigorously aver"

3    that estate taxes of $13,750,000 must be paid.  The letter also

4    states that Debtor had "contacted the IRS and will be meeting with

5    them on October 3, 2001." A true and correct copy of the aforesaid

6    letter is attached hereto as Exhibit B.

7        16.  In 2001, Cira initiated a separate action against Debtor

8    and others in the California Superior Court for the County of

9    Riverside entitled <u>Ross v. Ross</u> and bearing Case No. INC 025067.

10   This action asserted that Debtor had engaged in various acts of

11   elder abuse ("the Elder Abuse Case").

12       17.  The defendants in the Elder Abuse Case, including Debtor,

13   ultimately stipulated to the issuance of a preliminary injunction

14   restraining them from, among other things, contacting Cira directly

15   or indirectly.

16       18.  On or about January 18, 2002, the Debtor, Cira, and

17   certain of Debtor's relatives attended a Mandatory Settlement

18   Conference in the Probate Case (the "MSC").

19       19.  After substantial discussions the parties reached an

20   agreement (the "Probate Case Settlement") at the MSC, which was

21   then and there recited on the record in open court.

22       20.  As part of the Probate Case Settlement:

23           a.  Debtor agreed that all objections to Cira's Spousal

24           Property Petition were withdrawn such that, after certain

25           specific gifts were distributed from the Probate Estate as per

26           Ysaac's will, the balance of the Probate Estate would pass to

27           Cira, by intestate succession, as her community property

28           without further opposition or objection;

     b.   Debtor and various other parties would each receive the sum of $1 million from the Probate Estate, subject to certain now irrelevant contingencies;

     c.   Cira's community property share of the Probate Estate would bear all taxes associated with the distributions to Debtor and the others; and

     d.   The parties entered into a mutual general release of all claims between various parties including, but not limited to any claims by and between Debtor on the one hand and Cira, the Probate Estate or the Trust on the other hand.

21. At the Mandatory Settlement Conference in open court, Debtor represented that:

     a.   he understood that the Probate Case Settlement was a full and complete and final settlement of all of his claims in that matter;

     b.   he understood that at the time of the settlement he could not change his mind;

     c.   he did not need any further opportunity to talk to any other advisors or counsel before entering into the settlement; and

     d.   he was entering into the settlement and agreeing to be bound.

22.   The Probate Case Settlement was ultimately committed to writing which was executed by the parties on or about April 9, 2002 ("Written Settlement Agreement").  A true and correct copy of the same is attached hereto as Exhibit "C".

23.   After the MSC, and before Cira's execution of the Written Settlement Agreement, Debtor entered into a Distribution Agreement

1  (the "Distribution Agreement") dated February 11, 2002 wherein he

2  further represented, warranted, acknowledged and agreed that after

3  certain specific bequests were honored (the same ones referenced in

4  the Written Settlement Agreement), the "balance of decedent's

5  estate shall be distributed to Cira, or her assignee, as decedent's

6  community property under the intestate provision of Probate Code

7  Section 6401(a)."  Under the Distribution Agreement, a "Petition

8  for Determination of Entitlement to Estate Distribution (Probate

9  Code Section 11700)" (hereinafter, ("Entitlement Petition") was to

10  be filed by the Executor forthwith to request distribution of the

11  Probate Estate in the manner set forth in the Distribution

12  Agreement.  A true and correct copy of the Distribution Agreement

13  is attached hereto as Exhibit "D".

14      24.  At all times mentioned herein, by virtue of an

15  irrevocable assignment dated March 17, 2002, the Trust was Cira's

16  assignee and successor in interest under the Probate Case

17  Settlement.  A true and correct copy of the same, without exhibits

18  thereto, is attached hereto as Exhibit "E".

19      25.  In accordance with the Probate Case Settlement as

20  memorialized in the Written Settlement Agreement, and in or about

21  June of 2002, the sum of approximately $1,000,000 was placed in

22  escrow accounts for Debtor and for each of his other settling

23  relatives to be held for several years pending the occurrence of

24  certain specified contingencies (the "Escrow Accounts").  The sum

25  of approximately $300,000 was immediately released from the Escrow

26  Accounts to Debtor and to each of his other settling relatives.

27  The balance of the Escrow Accounts, about $700,000 for each, was

28  held subject to certain specified contingencies.

1     26.  Rubin is informed and believes that all sums held in the

2  Escrow Accounts have been released to Debtor and to his other

3  settling relatives.

4     27. On or about July 23, 2002, just shortly after the Escrow

5  Accounts were funded, a law firm in which Debtor was a principal,

6  Ross, Rose & Hammill, LLP (the "Ross Law Firm"), filed a creditor

7  claim in the Probate Case for $1.5 million (the "$1.5 Million

8  Claim") and another claim for $26,861.72 (collectively, "the

9  Claims").  Rubin is informed and believes, and thereon alleges,

10  that, shortly after receiving the Claims, the Executor of the

11  Probate Estate rejected the Claims and declined to negotiate with

12  Debtor regarding them.

13     28.  The $1.5 Million Claim appears to be based on an alleged

14  oral promise, disputed by Rubin, made to Debtor by Ysaac in 1992

15  that, upon Ysaac's death, Debtor would receive certain specified

16  real property in payment for alleged legal services.

17     29.  On or about August 28, 2002, the Probate Estate caused to

18  be filed in the Probate Case a document entitled: _Petition for_

19  _Preliminary Distribution (Probate Code Section 11620 et Seq.); and_

20  _for Approval of Extraordinary Attorneys' Fees and for Reduction in_

21  _Bond_ (the "Distribution Petition").  The Distribution Petition

22  sought a court order approving, among other things, a preliminary

23  distribution to the Trust of $15 million and a distribution to the

24  Trust of specified interests in real property.

25     30.  A hearing on the Distribution Petition was duly noticed

26  for October 1, 2002.  Notwithstanding the Probate Case Settlement,

27  Debtor appeared at the October 1, 2002 hearing and orally objected

28  to the Distribution Petition.  Debtor's objection was the only

1  objection made to the Distribution Petition and Debtor succeeded in

2  getting the hearing continued to October 28, 2002.

3      31.  On or about October 8, 2002, Debtor filed written

4  objections to the Distribution Petition.

5      32.  On or about October 25, 2002 - one court day before the

6  October 28, 2002 hearing - Debtor filed, through the Ross Law Firm,

7  yet another set of written objections to the Distribution Petition.

8      33.  At the conclusion of the October 28, 2002 hearing, the

9  Court continued the hearing on the Distribution Petition to

10  November 22, 2002.

11      34.  Debtor appeared at the November 22, 2002 hearing to

12  further oppose the Distribution Petition and presented lengthy

13  argument in support of his written and oral objections to the

14  Distribution Petition.

15      35.  During the November 22, 2002 hearing and on the record,

16  Debtor stated as follows:

17      I [Debtor] just have one other comment, Your Honor.  And
    that is if they are not worried, then let me make this
18      suggestion.  I will withdraw all of my objections.  If
    they are so confident, let them release the funds we have
19      in escrow on January the 11th [2002, pursuant to the
    Written Settlement Agreement] and I will have absolutely
20      no problem . . . [r]elease the funds on January the 11th,
    and we will walk.

21

22      36.  At the conclusion of the November 22, 2002 hearing, the

23  Probate Court took the matter under submission.  In a minute order

24  dated December 13, 2002, the Probate Court granted the Distribution

25  Petition, approving a preliminary distribution to the Trust with a

26  cash component of $10 million.

27      37.  In response to Debtor's actions as alleged above, and, on

28  or about October 17, 2002, Rubin and Cira, as co-trustees of the

1  Trust, filed an action seeking, among other things, damages for

2  breach of contract, fraud and abuse of process against Debtor in a

3  Riverside County Superior Court (Indio Branch) action entitled

4  <u>Jason Rubin and Cira Ross, as Co-Trustees of the Cira Ross</u>

5  <u>Qualified Domestic Trust v. David Ross et al.</u> bearing Case No. INC

6  031863 (the "State Court Action").

7       38.  On or about February 22, 2007, Rubin and Cira, as co-

8  trustees of the Trust, obtained a judgment (the "Judgment") against

9  Debtor.  The amount of the Judgment, without interest, is

10  approximately $1.8 Million.  A true and correct copy of the "Second

11  Augmented and Amended Judgment Against Both Defendants" is attached

12  as Exhibit "F".

13                       **FIRST CAUSE OF ACTION**

14                      **(11 U.S.C. §523(a)(2)(A))**

15       39.  Rubin re-alleges the Introductory Allegations and the

16  Background Facts set forth above and incorporates them by this

17  reference as if fully set forth here.

18       40.  Pursuant to the Probate Case Settlement, Debtor received

19  $1 Million tax free and a release of other claims.

20       41.  By entering into the Probate Case Settlement at the

21  Mandatory Settlement Conference, and by executing the Written

22  Settlement Agreement that memorialized it, and at the times that

23  Debtor did so, Debtor represented to the Trust's predecessor in

24  interest, Cira, that:

25            a.  he would honor the settlement agreement and the full

26       and final release of all claims therein;

27            b.  he would refrain from participating further in the

28       Probate Case after his entry into the settlement agreement;

1          c.    he would refrain from making any effort to prevent,

2    hinder or delay Cira from obtaining distribution of the

3    balance of the Probate Estate in accordance with the terms of

4    the settlement agreement;

5          d.    he would refrain from making any effort, after

6    entering into the settlement agreement, to obtain concessions

7    from Cira or the Probate Estate over and above those accorded

8    him under the settlement agreement; and

9          e.    he had not, prior to entering into the settlement

10    agreement, assigned any of the claims he was waiving and

11    releasing under the settlement.

12    42.   Debtor also specifically represented to Cira at the MSC

13    in open court (as alleged in Paragraph 21 above), that:

14          a.    he understood that the Probate Case Settlement was a

15    full, complete and final settlement of all of his claims in

16    that matter;

17          b.    he understood that at the time of the settlement

18    agreement he could not change his mind; and

19          c.    he was entering into the settlement agreement and

20    agreeing to be bound by it.

21    43.   By entering into the Distribution Agreement, Debtor

22    represented to Cira that:

23          a.    he would honor that agreement, and allow

24    distribution of the balance of the Probate Estate to Cira in

25    accordance with the terms of that agreement;

26          b.    he would take such further actions as the parties

27    reasonably request to effectuate the intent of the parties as

28    expressed in that agreement.

c.    he would refrain from interfering with, hindering or

delaying distribution of the balance of the Probate Estate to

Cira in accordance with the terms of that agreement; and

d.    he would refrain from participating further in the

Probate Case, after his entry into that agreement.

44.    Unbeknownst to Cira, each of Debtor's representations
made in connection with the Probate Case Settlement was false.  At
the time Debtor entered into the Probate Case Settlement and at the
time Debtor executed the Written Settlement Agreement, Debtor did
not intend to honor the Written Settlement Agreement, did not
intend to refrain thereafter from participating further in the
Probate Case, did not intend to cease his efforts to prevent,
hinder or delay Cira from obtaining distribution of the balance of
the Probate Estate, and did not intend to cease his efforts to
obtain concessions from Cira and the Probate Estate over and above
those accorded him under the settlement agreement.

45.    Unbeknownst to Cira, each of Debtor's representations
made in connection with the Distribution Agreement was false.
Debtor did not intend to honor the Distribution Agreement, did not
intend to allow the balance of the Probate Estate to be distributed
to Cira, did not intend to take such further actions as the parties
reasonably request to effectuate the intent of the parties as
expressed in that agreement, did not intend to refrain from
interfering further with the distribution of the balance of the
Probate Estate to Cira in accordance with the terms of that
agreement, did not intend to refrain from interfering with the
distribution of the balance of the Probate Estate to Cira in
accordance with the terms of that agreement, and did not intend to

1   refrain from participating further in the Probate Case.

2      46.   Debtor made each of the representations and false

3 pretenses to Cira, as alleged above, knowing that they were false,

4 and with intent to deceive Cira and to induce her to enter into,

5 execute and perform the Probate Case Settlement, the Written

6 Settlement Agreement and the Distribution Agreement, in that:

7      a.   contrary to his express representation and warranty

8     in the Written Settlement Agreement, Debtor had assigned the

9     $1.5 Million Claim to the Ross Law Firm, prior to entering

10     into the settlement agreement, in an effort to circumvent the

11     waiver and release provision of the settlement agreement

12     (Debtor did this because he was a party to the settlement

13     agreement, not the Ross Law Firm);

14     b.   Debtor knew that, after entering into the settlement

15     agreement, he would not honor the settlement agreement, or the

16     full and final release of all claims therein;

17     c.   Debtor knew that, after entering into the settlement

18     agreement and accepting the benefits accorded him thereunder,

19     he would continue to participate in the Probate Case in

20     violation of the settlement agreement;

21     d.   Debtor knew that, after entering into the settlement

22     agreement and accepting the benefits according him thereunder,

23     he would continue his efforts to prevent, hinder or delay Cira

24     or her assignee from obtaining distribution of the balance of

25     the Probate Estate; and

26     e.   Debtor knew that, after entering into the settlement

27     agreement and accepting the benefits accorded him thereunder,

28     he would continue his efforts to obtain concessions from Cira

1    and the Probate Estate over and above those accorded him under

2    the settlement agreement.

3        47.  As alleged above, after entering into the Probate Case

4    Settlement (as memorialized in the Written Settlement Agreement)

5    and after entering into the Distribution Agreement, Debtor

6    participated further in the Probate Case in an attempt to prevent,

7    hinder or delay Cira and her assignee from obtaining a distribution

8    from the Probate Estate.  Debtor also attempted to obtain

9    concessions from Cira and the Probate Estate over and above those

10   accorded him under the settlement agreement.

11       48. As a direct and proximate result of Debtor's

12   representations and false pretenses, as alleged above, Cira, the

13   Trust's predecessor in interest, was induced to enter into, execute

14   and perform the Probate Court Settlement, the Distribution

15   Agreement and the Written Settlement Agreement.

16       49. Had Cira been aware of the falsity of Debtor's

17   representations and false pretenses, as alleged above, she would

18   not have entered into the Probate Case Settlement, the Distribution

19   Agreement or the Written Settlement Agreement or performed under

20   them.

21       50.  Cira reasonably and justifiably relied on Debtor's

22   representations and false pretenses, as alleged above, insofar as:

23            a.   Debtor did not reveal to Cira that his

24       representations and false pretenses were deceitful;

25            b.   the misrepresentations and false pretenses were made

26       by Debtor, who was a licensed attorney, in open court at the

27       MSC;

28   ///

c.   Debtor signed the Written Settlement Agreement and the Distribution Agreement that memorialized and implemented the terms of the Probate Case Settlement;

d.   Debtor demonstrated partial compliance with the the Probate Case Settlement, prior to Cira's execution of the Distribution Agreement and the Written Settlement Agreement and prior to Cira's performance under those agreements by: (i) withdrawing his objections to, and refraining from interfering with, Cira's Spousal Property Petition such that it was granted on or about February 11, 2002; and (ii) stipulating to, and refraining from interfering with, the Entitlement Petition such that it was granted on or about April 9, 2002.

51.   As a direct and proximate result of Debtor's representations and false pretenses, as alleged above, the Trust has been damaged in the amounts set forth in the Judgment and the Debtor should be denied a discharge of the Judgment pursuant to 11 U.S.C. § 523(a)(2)(A).

## SECOND CAUSE OF ACTION

### (11 U.S.C. §523(a)(6))

52.   Rubin re-alleges the Introductory Allegations and the Background Facts set forth above and incorporates them by this reference as if fully set forth here.

53.   Debtor had an ulterior purpose in bringing and prosecuting the Claims and Objections shortly after executing the Written Settlement Agreement and obtaining a fully funded $1 Million Escrow Account.

54.   Debtor's ulterior purpose was to coerce concessions from Cira over and above those afforded him under the Probate Case

Settlement, the Distribution Agreement and the Written Settlement Agreement, including but not limited to payment of the Claims and, as evidenced by his statements on the record at the November 22, 2002 hearing on the Objections, release of the approximately $700,000 then held in each of the Escrow Accounts to Debtor and to his relatives. (The Written Settlement Agreement required Debtor and his relatives to wait for an extended period to receive their approximately $700,000, subject to specified contingencies.)

55. Debtor stated (see Paragraph 35 above) at the November 22, 2002 hearing that the Objections would be dropped if the approximately $700,000 then held in each of the Escrow Accounts was released to him and his relatives.  Debtor was well aware that, in view of the size of the distribution requested by the Distribution Petition - $15 Million - any delays in obtaining the court's approval would be tremendously damaging to the Trust.

56. Debtor brought his Claims and Objections in the Probate Case in order to resume his campaign to thwart distributions from the Probate Estate to Cira or her assignee, knowing that harm was substantially certain to the Trust.  Moreover, he took these actions to cause continued delay because it would cause harm.

57. Debtor's Claims and Objections were not proper in the regular course of the Probate Case because Debtor had expressly agreed, by entering into the Probate Case Settlement, the Distribution Agreement and the Written Settlement Agreement, that he and his assignees were absolutely and forever barred thereafter from raising any further objections or claims in the Probate Case.

58. Hence Debtor's decision to interpose the Claims and Objections, after having represented, warranted and agreed, among

other things, that he would not participate further in the Probate Case or seek to prevent, hinder or delay Cira or her assignee from obtaining distribution of the balance of the Probate Estate, constitutes the use of process as a form of extortion or undue influence, for which the process was not intended.

59.    Debtor's conduct was willful in that he intended to cause the harm that would be suffered in his effort to obtain the object of his efforts, distributions to which he was not entitled.  That Debtor offered to withdraw his objections if he obtained the further concessions only further demonstrates that his efforts were never intended to raise valid objections, but to cause harm, that could only be avoided by the further concessions.  The harm to be caused was the pivotal element in his effort to obtain these concessions.

60.    The conduct of the Debtor was malicious in that he engaged in tortious conduct (i.e., abuse of process), with an intent to obtain further concessions to which he was not entitled, and which caused harm to Cira or her assignee.

61.    As a direct and proximate result of the aforesaid willful and malicious acts of Debtor, the Trust has been damaged in the amounts set forth in the Judgment.

62.    The Debtor should be denied a discharge of the Judgment pursuant to 11 U.S.C. § 523(a)(6).

### THIRD CAUSE OF ACTION

### (11 U.S.C. §523(a)(6))

63.    Rubin re-alleges the Introductory Allegations and the Background Facts set forth above and incorporates them by this reference as if fully set forth here.

///

64.  On or about October 18, 2005, the court in the State Court Action imposed monetary discovery sanctions on Ross, the Ross Law Firm and their counsel of record, Robert Gentino, jointly and severally, in the sum of $966.  According to the order thereon, said sum was to be paid to the Plaintiffs in that action, through their counsel, on or by November 8, 2005.

65.  On or about March 10, 2006, the court in the State Court Action imposed additional monetary discovery sanctions on Ross, the Ross Law Firm and their counsel of record, Robert Gentino, jointly and severally, in the sum of $9,724.  According to the order thereon, said sum was to be paid to the Plaintiffs in that action within thirty days.

66. The court imposed the aforesaid discovery sanctions in view of the fact that Debtor had willfully, maliciously and repeatedly abused the discovery process.  One purpose of the sanctions orders was to provide recompense to the Trust for the attorney's fees it had expended due to Debtor's intransigence. Debtor willfully, maliciously and repeatedly abused the discovery process in order to, among other things, drive up the Trust's attorney's fees.  Debtor's intention in so acting was to increase the Trust's cost of prosecuting the State Court Action to such an extent that the Trust would drop the case entirely or settle it for a token sum.

67.  Debtor has violated the aforesaid orders by refusing to pay any portion of the aforesaid sanctions to the Trust, which has the effect of denying the Trust the recompense the court determined was due the Trust as a result of Debtor's abuse of the discovery process. The aforesaid sums, with interest thereon at the legal rate of 10% per annum from the respective dates upon which payment fell due, remain

1  due and owing from Debtor to the Trust, less any amounts which the

2  Trust obtained by levying on the assets of Robert Gentino.

3  **FOURTH CAUSE OF ACTION**

4  **(11 U.S.C. §727(a)(5))**

5      68.   Rubin re-alleges the Introductory Allegations and the

6  Background Facts set forth above and incorporates them by this

7  reference as if fully set forth here.

8      69.   Debtor has failed to explain satisfactorily the loss of

9  significant assets, including but not limited to those assets

10 related to the following:

11     a.   On or about February 20, 2002, Debtor executed and

12     submitted to Union Bank of California a loan application (the

13     "Union Bank Loan Application") which disclosed that he had

14     assets and a net worth of more than $5 Million, as well as a

15     net monthly income of more than $32,000.  A true and correct

16     copy of the loan application is attached hereto as Exhibit

17     "G";

18     b.   Thereafter, as set forth above, Debtor received an

19     additional approximately $300,000, pursuant to the Probate

20     Case Settlement, in or about 2002.  Moreover, Debtor received

21     another approximately $700,000 from his Escrow Account

22     thereafter pursuant to the terms of the Written Settlement

23     Agreement.  All taxes on the foregoing transfer were paid by

24     Cira as provided in the settlement agreement;

25     c.   In marked contrast to the disclosures in the Union

26     Bank Loan Application, Debtor represents in his bankruptcy

27     petition, schedules and Statement of Financial Affairs that

28     his assets amount to only $102,950.55 and his current monthly

1    income is a net negative of $2,200 per month.  The bankruptcy

2    documents offer no information regarding the disposition of

3    these assets;

4        d.    Rubin is informed and believes, and thereon alleges,

5    that within weeks before the Filing Date, Debtor arranged for

6    a purported "foreclosure" of his residence at 130 N. Martel

7    Ave., Los Angeles, by his counsel of record in the State Court

8    Action, Robert Gentino. The purported foreclosure was

9    undertaken pursuant to a deed of trust signed on the same date

10   that the Judgment was entered in the Trust's favor and against

11   Debtor in the State Court Action.  Rubin is informed and

12   believes that the purported foreclosure was a sham and a

13   fraudulent transfer intended to conceal Debtor's assets from

14   his creditors; and,

15       e.    Additionally, the Debtor has engaged in a fraudulent

16   divorce in Nevada for the purposes of disposing or concealing

17   assets from creditors.

18   70.  Rubin is informed and believes and thereon alleges that

19   Debtor has not identified all of his assets in his bankruptcy

20   petition, schedules and Statement of Financial Affairs, and that

21   Debtor will not be able to offer any explanation regarding the loss

22   or dissipation of the assets identified in his Union Bank Loan

23   Application or of the $1 Million he received in 2002 pursuant to

24   the Probate Case Settlement.

25   71. The Union Bank Loan Application, inasmuch as Debtor

26   completed it, attested to its accuracy by signing it and submitted

27   it to a lending institution for the purpose of obtaining credit,

28   provides an excellent and undeniable point of reference in the

1  effort to trace the disposition of Debtor's pre-petition assets.

2  Using this point of reference, it can be established that Debtor

3  has no valid explanation for the near total loss of his assets and

4  income, i.e., that Debtor has under reported his assets and income

5  in his bankruptcy filings.

6       72.   Debtor is unable to adequately explain the dissipation or

7  loss of his assets.

8       73.   Based on the conduct of the Debtor, he should be denied a

9  discharge pursuant to 11 U.S.C. § 727(a)(5).

10                    **FIFTH CAUSE OF ACTION**

11                    **(11 U.S.C. §727(a)(3))**

12       74.   Rubin re-alleges the Introductory Allegations and the

13  Background Facts set forth above and incorporates them by this

14  reference as if fully set forth here.

15       75.   Rubin is informed and believes and thereon that Debtor

16  has concealed, destroyed, mutilated, falsified or failed to keep or

17  preserve any recorded information from which the Debtor's financial

18  condition or business transaction might be ascertained, including

19  but not limited to the following:

20       a.    According to a 2005 report filed by the forensic

21       accountant engaged by Soraya Ross, in <u>In re the Marriage of</u>

22       <u>Petitioner Soraya Ross and Respondent David Ross</u> (Los Angeles

23       Superior Court Case No. BD401750), Debtor has engaged in

24       various subterfuges in order to hide his income;

25       b.    Rubin is informed and believes that Debtor filed, in

26       the aforesaid marital dissolution action, a declaration in

27       which he acknowledged initiating a sham Nevada divorce action

28       for the purpose of concealing his assets from a creditor; and,

c.    Rubin is informed and believes, and thereon alleges, that within weeks before the Filing Date, Debtor arranged for a purported "foreclosure" of his residence at 130 N. Martel Ave., Los Angeles, by his counsel of record in the State Court Action, Robert Gentino. The purported foreclosure was undertaken pursuant to a deed of trust signed on the same date that the Judgment was entered in the Trust's favor and against Debtor in the State Court Action.  Rubin is informed and believes that the purported foreclosure was a sham and a fraudulent transfer intended to conceal Debtor's assets from his creditors.

76.  The Debtor has falsified and concealed information relative to his assets and financial condition and should be denied discharge pursuant to 11 U.S.C. § 727 (a)(3).

### SIXTH CAUSE OF ACTION

### (11 U.S.C. §727(a)(2)(A))

77.  Rubin re-alleges the Introductory Allegations and the Background Facts set forth above and incorporates them by this reference as if fully set forth here.

78.  Rubin is informed and believes that, with intent to hinder, delay or defraud a creditor or an officer of the estate, Debtor has transferred, removed, destroyed, mutilated or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed property of the Debtor within one year before the Filing Date by, among other things, arranging within weeks before the Filing Date for the purported "foreclosure" of his residence at 130 N. Martel Ave., Los Angeles, by his counsel of record in the State Court Action, Robert Gentino. The purported foreclosure was

undertaken pursuant to a deed of trust signed on the same date that the Judgment was entered in the Trust's favor and against Debtor in the State Court Action.   Rubin is informed and believes that the purported foreclosure was a sham and a fraudulent transfer intended to conceal Debtor's assets from his creditors.

79.   As a consequence of the conduct of the Debtor, he should be denied a discharge pursuant to 11 U.S.C. § 727(a)(2)(A).

## SEVENTH CAUSE OF ACTION

### (11 U.S.C. §727(a)(4))

80.   Rubin re-alleges the Introductory Allegations and the Background Facts set forth above and incorporates them by this reference as if fully set forth here.

81.   Rubin is informed and believes and upon such information and belief alleges that the Debtor has made a false oath in connection with his bankruptcy, including but not limited to transferring his home to his counsel of record in the State Court Action in a highly suspect "foreclosure" transaction.

82.   Rubin is informed and believes, and thereon alleges, that Debtor's bankruptcy petition, schedules and Statement of Financial Affairs do not fully, completely and accurately disclose all of his assets as of the filing, and that Ross has concealed such assets from this Court, from the bankruptcy trustee and from his creditors.

83.   The conduct of the Debtor constitutes a false oath and further justifies a denial of discharge to Debtor pursuant to 11 U.S.C. § 727(a)(4).

///

///

# EIGHTH CAUSE OF ACTION

## (11 U.S.C. §523(a)(6))

84.   Rubin re-alleges the Introductory Allegations and the Background Facts set forth above and incorporates them by this reference as if fully set forth here.

85.   As alleged above in Paragraphs 13 through 15, Debtor sent letters to Cira, prior to her entry into the Probate Case Settlement, in which he willfully and maliciously threatened that, unless Cira agreed to release half of the Probate Estate to him and his relatives, he would assert to the court and to the Internal Revenue Service that the Probate Estate must pay an exorbitant and undue amount of taxes.

86. As a direct and proximate result of Debtor's threats, as alleged above, Cira was induced to enter into the Probate Case Settlement, the Distribution Agreement and the Written Settlement Agreement, and to perform them, which included, among other things, transferring the sum of $1 Million to Debtor and paying the taxes accruing on that transfer.

87. Debtor's threats, as alleged above, constitute criminal extortion and was intended to cause harm and did cause harm to Cira as alleged above.

88.   Debtor's conduct was willful in that he intended the extortion from Cira as that would compel her to cede to his demands to which he was not entitled.  Without the use of extortion, the conduct would not have achieved the goal of obtaining funds to which he was not entitled, thereby establishing that the act was intended to produce the very harm suffered.

89.   As a proximate result of the conduct of the Debtor, Plaintiff has been damaged in a sum according to proof at the time of

1 trial.

2      90.   The conduct of the Debtor was malicious in that it was
3 criminal, there was no just cause for the conduct, it was intended to
4 cause the harm it did.

5      91.   Based on the conduct of the Debtor, he should be denied a
6 discharge pursuant to 11 U.S.C. § 523(a)(6).

7      **WHEREFORE,** Plaintiff prays for judgment against Debtor David
8 Ross, as follows:

9 First Cause of Action

10     1.   For a determination that the $1.8 Judgment is not
11 dischargeable pursuant to 11 U.S.C. §523(a)(2)(A);

12 Second Cause of Action

13     2.   For a determination that the $1.8 Judgment is not
14 dischargeable pursuant to 11 U.S.C. §523(a)(6);

15 Third Cause of Action

16     3.   For a determination that the sanctions awards are not
17 dischargeable pursuant to 11 U.S.C. §523(a)(6);

18 Fourth Cause of Action

19     4.   For consequential damages as a consequence of the abuse of
20 process by the Debtor in a sum according to proof at the time of
21 trial;

22     5.   For a determination that damages incurred as a consequence
23 of the abuse of process by the Debtor is not dischargeable pursuant
24 to 11 U.S.C. §523(a)(2)(A);

25 Fifth Cause of Action

26     6.   For a declaration that the Debtor has failed to adequately
27 explain his loss of assets;

28 ///

1      7.   For a determination that Debtor is not entitled to a

2  discharge pursuant to 11 U.S.C. § 727(a)(5);

3  Sixth Cause of Action

4      8.   For a declaration that the Debtor has concealed or

5  falsified records from which his financial condition can be

6  determined;

7      9.   For a determination that the Debtor is not entitled to a

8  discharge pursuant to 11 U.S.C. § 727(a)(3);

9  Seventh Cause of Action

10     10.  For a declaration that the Debtor has transferred,

11 removed, destroyed, mutilated or concealed or permitted to be

12 transferred, removed, destroyed, mutilated or concealed property of

13 the debtor within one year of the Filing Date;

14     11.  For a determination that the Debtor is not entitled to a

15 discharge pursuant to 11 U.S.C. § 727(a)2)(A);

16 Eighth Cause of Action

17     12.  For a declaration that the Debtor knowingly and

18 fraudulently made a false oath or account in connection with his

19 bankruptcy case;

20     13.  For a determination that the Debtor is not entitled to a

21 discharge pursuant to 11 U.S.C. § 727(a)(4);

22 Ninth Cause of Action

23     14.  For damages in a sum according to proof at the time of

24 trial;

25     15.  For a determination that the damages suffered by

26 Plaintiff are not dischargeable pursuant to 11 U.S.C. §523(a)(6);

27 ///

28 ///

<u>On all Causes of Action</u>

16.   For costs of suit incurred herein; and,

17. for such other and further relief as the Court may deem just and proper.

Dated: November 13, 2009                    LAW OFFICES OF DAVID A. TILEM

By: _____
David A. Tilem, attorney for
Creditor Jason Rubin, as Co-
Trustee of the Cira Ross
Qualified Domestic Trust

**EXHIBIT A**

September 21, 2001

Cira Tapia Ross
616 High St.
Palm Springs, CA

Dear Aunt Cira:

We hope this letter finds you in good health. Today, for the first time it appeared to us that you may not be aware about the situation concerning the distribution of the estate. It is our understanding that you may not have even seen our proposal to settle the matter. You know Ysaac's feelings about lawyers and it seems to us that the only ones who will come out with any money will be the lawyers unless we can get this matter settled.

We want you know that this whole problem began when the lawyers got involved. Before that we all understood that you would be taking half the estate and the other half would go to the 14 living family members. Now, the lawyers are trying to take away our half and forcing us to go to court and fight, and tear the family apart for no reason. We were told by the lawyers that some of the cousins are being taken care of and this has forced the 6 of us to protect ourselves.

Now because of this needless fight, we are being forced to argue that you must pay a large sum of money in taxes by October 11. If that happens no one will benefit and everyone will lose. Please do not let this happen we know Ysaac would never have allowed this.

We would like to meet in person with you and with as many of the 14 relatives as possible anywhere you want so that we can stop the madness and make peace with the family. We know that this is the fair way of keeping half for you and your family and half for Ysaac's family.

Sincerely,

David Ross,    Gloria Karp,    Susan Parker,    Anna Young,    Morrie Glickman

cc: Jason Rubin
     Sylvia Mandel

**EXHIBIT B**

September 26, 2001

Mr. William R. Wickham
Merrill Lynch
415 S. Palm Canyon Drive
Palm Springs, CA 92262

RE:    Estate of Y. Ross

Dear Mr. Wickham:

I am extremely concerned about the turn of events in the above-mentioned matter.  On September 21, 2001, we learned from Jason Rubin at his deposition that Cira Tapia Ross, your client, was, and is, unaware of the present ongoing litigation and her own purported position regarding a favorable disposition of the estate.  Furthermore, subsequent to the deposition, we learned that Cira believes that you are handling this matter and she did not even remember who Mr. Sussman was.  Finally, we were told by Mr. Rubin and Mr. Sussman that you were responsible for Cira retaining Mr. Sussman.

As you may or may not know, on October 5, 2001, there will be a critical hearing concerning the filing of tax returns and payment of taxes.  We have offered on numerous occasions to stipulate to the spousal petition filed by Mr. Sussman in exchange for a settlement for Yssac's relatives.  Unfortunately, we have been met with obstructionism, lies, and stonewalling.  As a result, because Yssac's and Cira's tax returns for the last three (3) decades were filed separately and as single people, Yssac's will declares that he is single and that the property is separate, all of the estate's commercial property was held as Yssac's separate property, and all of his and Cira's assets with you were and are held as separate property, we have concluded that unless we can reach a settlement of the estate we must vigorously aver that the estate's assets are Yssac's separate property.  This position forces us to demand that estate taxes in the amount of $13,750,000 (one half of $27,500,000, which is one half of the declared estate of $55,000,000 as sworn to in court papers by the special co-administrators) be paid on or before October 11, 2001 (nine months to the anniversary of Yssac's death).

Because we believe that the special co-administrators will try to influence the estate attorneys not to pay the said taxes and subject the estate to a severe interest payment and potential future penalty, I have contacted the IRS and will be meeting with them on October 5, 2001, at their District Office at the federal building in Los Angeles, to discuss the entire situation.  Any damage to the estate because of Mr. Sussman's or Mr. Rubin's actions, or any failure to reign in them, will be dealt with in appropriate legal actions.

I simply can not believe that you let this matter come to this point, particularly knowing what Yssac would have wanted and his aversion to unnecessary litigation and is wasting of his assets.  I know in the past you have given excellent advice to Yssac, and that Cira relies heavily on your opinion.  Even Mr. Sussman made it clear that he talked to Cira through you and your secretary.  Accordingly, should you wish to speak with me, please do not hesitate to contact me at (310) 216-3333.

David L. Ross

**EXHIBIT C**

## SETTLEMENT AGREEMENT
## AND MUTUAL RELEASE OF ALL CLAIMS

THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE OF ALL CLAIMS ("Agreement") is dated as of April 9, 2002, for reference purposes, and is made and entered into by and between the following:

SYLVIA MANDEL, as Executor of the Estate of Ysaac Ross, Deceased ("Executor");

CIRA TAPIA ROSS, the Surviving Spouse of Ysaac Ross ("Cira"); and

ANNA YOUNG, BEA SILPA, MORRIS GLICKMAN, IDA RUBIN, LINDA PARMENTIER, GLORIA KARP, DAVID L. ROSS, SUSAN PARKER, ESTHER RICHMOND, and SYLVIA MANDEL (individually as "Beneficiary" and collectively, the "Beneficiaries").

### RECITALS:

A.    YSAAC ROSS died on January 11, 2001, a resident of Riverside County, California ("Decedent"). The Decedent's Will, dated July 27, 1987, and first Codicil thereto, dated April 16, 1992, was filed with a Petition for Probate and for Special Letters of Administration, whereby Sylvia Mandel and Jason Rubin were appointed Special Co-Administrators of the Decedent's estate. Sylvia Mandel, named in the Decedent's Will to act as Executor, was appointed Executor of the Decedent's estate on January 18, 2002.

B.    Cira and the Decedent were married on July 31, 1950, in Orange County, California, fifty years prior to the Decedent's death. The Decedent was survived by Cira, as his Surviving Spouse, and the Beneficiaries, some of who are named as specific devisees in the Decedent's Will and are intestate heirs of the Decedent. The Decedent was not survived by issue.

C.    The Decedent made certain allegations in his Will that his estate consisted of separate property and although he declared himself to be single, he made certain provisions for Cira in the form of specific bequests. The Decedent's Will did not dispose of the Decedent's entire estate.

D.    On or about September 4, 2001, Cira filed a Spousal Property Petition whereby she sought a judicial determination that the Decedent's estate consisted entirely of community property and that therefore she was entitled to one-half of the estate as her community property, and that she was entitled to that portion of the Decedent's community property that was not disposed of by his Will. Some of the Beneficiaries objected to various matters filed in the probate proceeding, including Cira's Spousal Property Petition.

E.    A mandatory settlement conference was held on January 18, 2002, and the

parties hereto reached a settlement which was placed on the record. The purpose of this Agreement is to memorialize that settlement in accordance with the terms thereof.

NOW, THEREFORE, the parties hereto agree as follows:

1.    **Estate Consists of Community Property.** The parties hereto acknowledge that all property owned by the Decedent and Cira, whether in their individual names or in their joint names, constitutes their community property. The Beneficiaries withdrew their objections to Cira's Spousal Property Petition which proceeded to trial on February 11, 2002. Upon judicial determination that all property was community property, one-half of the community property estate was set aside to Cira or her assignee, and the Decedent's one-half interest was to be held by the Executor and distributed pursuant to court order in that proceeding, as further set forth in Paragraph 2 of this Agreement.

2.    **Distribution of Probate Estate.** The Executor filed a Petition for Determination of Entitlement to Estate Distribution (Probate Code Section 11700) ("Petition") in the estate proceeding. The Petition requested distribution of the Decedent's estate as follows:

(a)    The specific bequest of $25,000.00 cash to Cira as set forth in Article FIFTH of the Decedent's Will, is to be distributed to Cira, but no additional amounts are to be paid to Cira under Articles THIRD and SIXTH of the Will.

(b)    The specific pecuniary bequests set forth in Article SIXTH shall be paid, except that the Decedent's sister, Dora Ross Glickman, predeceased the Decedent, so the $50,000.00 bequest to her instead shall be distributed pursuant to the provisions of Probate Code Section 21110(a).

(c)    The Decedent's one-half interest in the real property located at 2454-2460 West Pico Boulevard shall be distributed to Ida Rubin, together with $2,000.00 per month until the earlier of the date of distribution or the sale of the property pursuant to the provisions of Article SEVENTH of the Decedent's Will.

(d)    The Decedent's one-half interest in the real property located at 2101-2117 West Pico Boulevard (1243-1247 Alvarado Boulevard) shall be distributed to Sylvia Mandel pursuant to the provisions of Article EIGHTH, Subparagraph (g) of the Will, as amended by Paragraph 2 of the Decedent's Codicil.

(e)    The balance of the Decedent's estate shall be distributed to Cira, or her assignee, as Decedent's community property under the intestate provisions of Probate Code Section 6401(a).

The Executor's Petition was approved on April 9, 2002.

3.    **Gift by Cira.** Cira acknowledges that although the estate constitutes community property, it is her desire that the Beneficiaries, being some of Decedent's surviving

2

033

family members, receive a portion of the community property estate in addition to the specific bequests provided in the Decedent's Will. Accordingly, Cira will make a gift of $1,000,000.00 to each of the Beneficiaries within three (3) business days after Cira and that Beneficiary have executed this Agreement. The date of the gift shall be the date the funds comprising the gift clear with the Escrow Holder, hereinafter set forth ("date of gift"). Cira shall make the gift from funds received by her as her community property and not from funds distributable to her from the Decedent's probate estate.

The parties hereto acknowledge that the gift made by Cira is a bona fide gift without consideration.

4.    **2002 Gift Tax Returns.** Cira, as the donor, shall be responsible for and shall pay all gift taxes on the gifts made to the Beneficiaries. Cira shall be responsible for filing all required federal gift tax returns for the 2002 calendar year, due on or before April 15, 2003.

5.    **Decedent's Federal Estate Tax Return.** The Executor has filed the federal estate tax return for the Decedent's estate reflecting the tax liability based on the judicial determination that the Decedent's entire estate is community property and that the portion of the estate distributable to Cira will qualify for the marital deduction (subject to adjustment for distributions pursuant to the family allowance). The Executor has requested an early discharge from personal liability under Section 2204 of the Internal Revenue Code.

6.    **Beneficiary's Deposit.** The gift by Cira provided for in Section 3 of this Agreement shall be made payable to each Beneficiary and Union Bank, 9460 Wilshire Boulevard, Beverly Hills, California ("Escrow Holder") and deposited by the Beneficiary in a separate irrevocable escrow account at Escrow Holder (See Attachment 'A' for each account) and shall be distributed pursuant to the following terms and conditions:

(a)    Concurrently upon deposit of the gift by each Beneficiary and confirmation of available funds, the following amounts shall be paid by the Beneficiary and Escrow Holder to the law firm of Ross, Rose & Hammill ("Law Firm"), less any previous sums paid by the Beneficiary to that law firm for matters pertaining to the estate of Ysaac Ross, deceased:

| | |
|---|---|
| Ida Rubin | $ 15,000.00 |
| Esther Richmond | 15,000.00 |
| Sylvia Mandel | 15,000.00 |
| Bea Silpa | 30,000.00 |
| Gloria Karp | 30,000.00 |
| Morris Glickman | 30,000.00 |
| Susan Parker | 30,000.00 |
| Linda Parmentier | 30,000.00 |
| Anna Young | 30,000.00 |
| TOTAL | $225,000.00 |

3

The foregoing sums shall constitute attorneys' fees paid by each of the above named Beneficiaries to the Law Firm for services rendered in this proceeding. Escrow Holder may rely solely on the written statement of the Law Firm as to the previous sums paid by that Beneficiary for services rendered in this proceeding, and neither Cira or Escrow Holder shall otherwise be concerned.

(b)     Each Beneficiary and Escrow Holder shall then make a gift in the sum of $10,000.00 to the Decedent's grandniece, Sara Richmond.

(c)     Each Beneficiary and Escrow Holder shall then disburse to the Beneficiary the sum of $300,000.00, less the amounts distributed by each Beneficiary as provided in Subparagraphs (a) and (b) above.

(d)     The balance of each Beneficiary's $700,000.00 shall be held by the Beneficiary and Escrow Holder in accordance with the terms set forth in Paragraph 7.

7.     <u>Holdback</u>. The balance of the Beneficiary's gift shall be held, managed and distributed as follows:

(i)     The Beneficiary shall provide his or her social security number and shall be responsible for reporting all income generated on said account for income tax purposes. The Beneficiary shall be entitled to invest the funds in Escrow Holder's money market or savings account, U.S. Treasury obligations or corporate bonds (Moody AAA) and shall receive 45% of the net income generated by the Beneficiary's account on an annual basis, distributable quarterly or in other convenient installments.

(ii)     In the event of Cira's death within three years of the date of the gift thereby causing the gift tax paid by her on the $1,000,000.00 gift provided for in Section 3 to be included in her estate for estate tax purposes, the Beneficiary and Escrow Holder shall, subject to the claim procedure set forth in Paragraph 8, distribute to Cira's personal representative or trustee an amount equal to the increase in her estate taxes resulting from such inclusion but no more than $250,000.00. Each Beneficiary's holdback shall be subject to a claim based on the gift tax inclusion for his or her gift only. On the earlier of (1) three years after the date of the gift, or (2) the death of Cira within the period that ends three years after the date of the gift, the Beneficiary shall be entitled to withdraw any remaining portion of the $250,000.00, plus accrued but undistributed income generated thereon, from the escrow account established for that Beneficiary.

(iii)     In the event any additional estate taxes are assessed on the assets in the Decedent's estate as a result of the recharacterization of the Decedent's estate as separate property such that the gift from Cira shall be deemed a bequest received by the Beneficiary from the Decedent and thus not qualified for the marital deduction in his estate, the Beneficiary and Escrow Holder shall, subject to the claim procedure set forth in Paragraph 8,

4

distribute to Cira, or her personal representative or trustee, an amount equal to the increase in Decedent's estate taxes attributable to Cira's gift to the Beneficiary resulting from such recharacterization, but no more than $450,000.00. Each Beneficiary's holdback shall be subject to a claim for estate taxes based on his or her gift only. Three years following the filing of the federal estate tax return for the Decedent (including the Executor's request for early audit under IRC 2204), or earlier should the return be audited and accepted by the Internal Revenue Service, or alternatively, accepted in writing by the Internal Revenue Service without an audit as filed, thus releasing the Executor from liability therefor, the Beneficiary shall be entitled to withdraw any remaining portion of the $450,000.00, plus accrued but undistributed income generated thereon from the escrow account established for that Beneficiary.

8.    **Claim Procedure.**  In the event that Cira or Cira's personal representative or Trustee believes that she is entitled to reimbursement as provided above, notice shall be given to each Beneficiary and Escrow Holder for which a claim is or may be sought under Paragraph 7. Such notice shall be given within thirty (30) days after Cira, her personal representative or trustee, obtains knowledge of such claim. In the event that the Beneficiary disputes the amount of the claim by Cira, her personal representative or trustee, then either Cira, her personal representative or trustee or the Beneficiary shall, within 30 days thereafter, file a motion seeking judicial determination and resolution as provided in Paragraph 9. Upon receipt of a written claim by Cira, Escrow Holder shall not distribute that portion of the holdback subject to the claim without a written mutual agreement of Cira, her personal representative or trustee, and the Beneficiary, or upon receipt of a court order authorizing Escrow Holder to do so as provided in Paragraph 9. In any third party audit or proceeding, administrative or otherwise, and during negotiation or arbitration, if any, each Beneficiary shall have the right to participate, individually or through legal counsel of the Beneficiary's choice, and to otherwise participate in the defense of the claim at the Beneficiary's expense. In any claim dispute, Escrow Holder need not be involved and the parties to this Settlement Agreement agree to release and hold harmless Escrow Holder from any cost, liability or expense associated therewith.

9.    **Court Jurisdiction.**  All parties acknowledge that this is a court supervised settlement and that the Riverside County Superior Court will retain jurisdiction under CCP 664.6. The provisions of this Agreement may be enforceable by motion and subsequent judgment in any proceeding brought for that purpose.

10.    **Designation of Survivor.**  Each Beneficiary may designate a recipient of the balance of the account should the Beneficiary die during the holdback period. Further, each Beneficiary may designate his or her revocable trust, in which the Beneficiary is a trustor and trustee, as the designated beneficiary of that account. Notwithstanding such designation, any successor to that account shall be subject to holdback and indemnification provisions for the time periods provided herein and subject to all the conditions of this Settlement Agreement.

11.    **No Admission of Liability.**  This Agreement is a mutual compromise and is not intended to be nor shall be construed as an admission of liability by any party hereto or any of their respective agents, employees or representatives, nor shall it be construed as an admission

5

036

that any claim or cause of action is without merit. The parties hereto hereby explicitly deny any legal liability of any kind arising out of this matter and enter into this Agreement only as the most efficient way to economically terminate all disputes arising therefrom and relating thereto.

12.    **Mutual Release.** Except for the executory provisions of this Agreement, each party, the Executor, Cira and the Beneficiaries, on behalf of themselves and each of their respective successors and assigns, does hereby fully and forever mutually release and discharge the other parties hereto and each of the predecessors, successors and assigns of the other party and respective stockholders, partners, members, directors, officers, attorneys, accountants, consultants, representatives, employees, agents, heirs, successors and assigns of the other party, of and from any and all liabilities, claims, demands, contracts, debts, obligations and causes of action, in law, equity, or otherwise, that any party, individually and jointly, has held, now holds, or may hold in the future, whether known or unknown, concealed or hidden, suspected or unsuspected, which was created or arose out of the subject matter of this Agreement. This release shall specifically include, but shall not be limited to, any claims or causes of action, past, present or future, as well as claim based on elder abuse against Cira and any pending temporary restraining orders or preliminary injunctions now existing.

13.    **General Release.** Each party hereto intends this Agreement, once duly executed, shall be effective as a complete and final bar to each and every liability, claim, demand, contract, debt, obligation and cause of action, in law, equity or otherwise, that he or she has or might have against any other party released herein, as provided by California Civil Code Section 1541. Each party hereby explicitly relinquishes and waives all rights and benefits conferred by the provisions of Section 1542 of the California Civil Code, which reads as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

Each party hereto represents that the party has read and understands the foregoing provisions of California Civil Code Section 1542, and in so waiving such provision, the parties hereby acknowledge that they may hereafter discover facts in addition to or different from those which they now believe to be true with respect to the matters herein released, but agree that they have taken that possibility into account in determining the amount of consideration to be given under this Agreement, and that the general releases herein given shall be and remain in effect as full and complete general releases notwithstanding the discovery or existence of any such additional or different facts, of which the parties expressly assume the risk.

14.    **Non-Assignment of Claims.** Each party hereto represents and warrants that it has not heretofore assigned any rights, claims, causes of action, or defenses released herein and that no other person, firm, corporation, estate, or other entity has had or now has any interest in any of the rights, claims, causes of action, or defenses released herein. Each party agrees to indemnify and hold harmless each other party from any loss, expense, damage, liability, claim, or

6

037

demand, including reasonable attorneys' fees and costs, by reason of any actual or purported assignment or transfer of any matter released herein.

15.   **Consultation with Legal Counsel.** .Each party to this Agreement represents that it has been advised to or has consulted with independent legal counsel and secured independent advice and consultation concerning every aspect of this Agreement and the rights and liabilities he is hereby relinquishing.

16.   **Attorneys' and Accountants' Fees and Costs.** Each party hereto agrees to bear its own legal and accounting fees and costs relating to this Agreement, and each hereby waives any and all claims it may have against the other, individually or severally, for attorneys' and accountants' fees or costs, except that in the event an action or proceeding is brought to enforce the terms of this Agreement the prevailing party shall be entitled to recover reasonable attorneys', accountants' and/or professional consultants' fees and costs.

17.   **Notices.**  All notices, demands, approvals and other communications required to be in writing under this Agreement shall be delivered to the appropriate party at its address set forth following his or her signature to this Agreement.  Addresses for notice may be changed from time to time by written notice to all other relevant parties.  All notices or other communications required or permitted hereunder shall be in writing, and shall be personally delivered or sent by certified mail, postage prepaid, return receipt requested, telegraphed, hand-delivered or sent by facsimile transmission (with confirmation copy by U.S. mail) and shall be deemed received upon the earlier of (i) if personally delivered, the date of delivery to the address of the person to receive such notice, (ii) if mailed, the date shown as the date of delivery on the return slip verifying delivery, or (iii) if faxed, the date of the confirmed facsimile transmission.

18.   **Entire Agreement.**  This Agreement contains the entire agreement of the parties, and any other promise or inducement, representation, oral or written, not set forth in this Agreement shall have no force and effect.

19.   **Amendments.**  Any amendment or modification of this Agreement shall be valid only if in writing and signed by the parties to be bound.

20.   **Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors, assigns and representatives of each party.

21.   **Governing Law.**  This Agreement shall be governed by and construed under the laws of the State of California applicable to contracts made in such state, without reference to conflicts of law principles.

22.   **Further Cooperation.**  The parties hereto agree to execute and deliver such further documents or instruments and take such further actions as the parties shall reasonably request to effectuate the intent of the parties as expressed herein.

7

23.   **Counterpart and Facsimile/Photocopy Signatures.**  This Agreement may be signed in any number of counterparts, each of which shall be deemed an original and all of which shall be deemed one and the same instrument.  A facsimile or photocopy shall be deemed to have the same force and effect as an original.

24.   **Deemed to be Prepared by All Parties.**  In interpreting this Agreement it shall be deemed that it was prepared by all of the parties jointly and no ambiguity shall be resolved against any party on the premise that it or its attorneys was responsible for having drafted this Agreement or the provision at issue.

25.   **Full Authority.**  Each signatory to this Agreement represents and warrants that he or she has the full authority and power to bind the party for whom he or she is executing this Agreement.

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of the date first set forth above.

**Executor:**

_____
SYLVIA MANDEL

Address: c/o Walter, Finestone & Richter
            11601 Wilshire Blvd., Suite 1900
            Los Angeles, CA 90025

**Cira:**

_____
CIRA TAPIA ROSS

Address: 616 High Road
            Palm Springs, CA 92262

**Beneficiaries:**

_____
ANNA YOUNG

Address: 16456 Westfall Place
            Encino, CA 91436

_____
BEA SILPA

Address: 16611 Adlon Road
            Encino, CA 91436

8

**Beneficiaries**:

_(signature)_
MORRIS GLICKMAN

Address: 15422 Milldale Drive
         Los Angeles, CA 90077-1601

_(signature)_
IDA RUBIN

Address: 5727 Etiwanda Drive, Unit 1
         Tarzana, CA 91356

_(signature)_
LINDA PARMENTIER

Address: 1766 Nuevo Road
         Henderson, NV 98014

_(signature)_
GLORIA KARP

Address: 23425 Park Hermosa
         Calabasas, CA 91302

_(signature)_
DAVID L. ROSS

Address: 715 N. Hillcrest Road
         Beverly Hills, CA 90210

_(signature)_
SUSAN PARKER

Address: 6003 County Oak Road
         Woodland Hills, CA 91367-1085

_(signature)_
ESTHER RICHMOND

Address: 2804 Medill Place
         Los Angeles, CA 90064

_(signature)_
SYLVIA MANDEL

Address: 3839 Royal Woods Drive
         Sherman Oaks, CA 91403

9

040

**EXHIBIT D**

## DISTRIBUTION AGREEMENT

THIS DISTRIBUTION AGREEMENT ("Agreement") is dated as of February 11, 2002, for reference purposes, and is made and entered into by and between the following:

SYLVIA MANDEL, as Executor of the Estate of Ysaac Ross, Deceased ("Executor");

CIRA TAPIA ROSS, the Surviving Spouse of Ysaac Ross ("Cira"); and

ANNA YOUNG, BEA SILPA, MORRIS GLICKMAN, IDA RUBIN, LINDA PARMENTIER, GLORIA KARP, DAVID L. ROSS, SUSAN PARKER, ESTHER RICHMOND, and SYLVIA MANDEL (individually as "Beneficiary" and collectively, the "Beneficiaries").

### RECITALS:

A.    YSAAC ROSS died on January 11, 2001, a resident of Riverside County, California. The decedent's Will, dated July 27, 1987, and first Codicil thereto, dated April 16, 1992, was filed with a Petition for Probate and for Special Letters of Administration, whereby Sylvia Mandel and Jason Rubin were appointed Special Co-Administrators of the decedent's estate. Sylvia Mandel, named in the decedent's Will to act as Executor, was appointed Executor of the decedent's estate on January 18, 2002.

B.    Cira and the decedent were married on July 31, 1950, in Orange County, California, fifty years prior to the decedent's death. The decedent was survived by Cira, as his Surviving Spouse, and the Beneficiaries, some of who are named as specific devisees in the decedent's Will and are intestate heirs of the decedent. The decedent was not survived by issue.

C.    The decedent made certain allegations in his Will that his estate consisted of separate property and although he declared himself to be single, he made certain provisions for Cira in the form of specific bequests. The decedent's Will did not dispose of the decedent's entire estate.

D.    On or about September 4, 2001, Cira filed a Spousal Property Petition whereby she sought a judicial determination that the decedent's estate consisted entirely of community property and that therefore she was entitled to one-half of the estate as her community property, and that she was entitled to that portion of the decedent's community property that was not disposed of by his Will. Some of the Beneficiaries objected to various matters filed in the probate proceeding, including Cira's Spousal Property Petition.

042

E.    A mandatory settlement conference was held on January 18, 2002, followed by a proceeding on February 11, 2002 at which time the Court determined that the decedent's entire estate constituted community property. In accordance therewith, this Agreement confirms the consent of Cira and the Beneficiaries to distribution of the decedent's estate in accordance with the terms herewith.

NOW, THEREFORE, the parties hereto agree as follows:

1.    **Distribution of Probate Estate.** The Executor shall forthwith proceed to file a Petition for Determination of Entitlement to Estate Distribution (Probate Code Section 11700) in the estate proceeding. That petition shall request distribution of the decedent's estate as follows:

(a)    The specific bequest of $25,000.00 cash to Cira as set forth in Article FIFTH of the decedent's Will, is to be distributed to Cira, but no additional amounts are to be paid to Cira under Articles THIRD and SIXTH of the Will.

(b)    The specific pecuniary bequests set forth in Article SIXTH shall be paid, except that the decedent's sister, Dora Ross Glickman, predeceased the decedent, so the $50,000.00 bequest to her instead shall be distributed pursuant to the provisions of Probate Code Section 21110(a).

(c)    The decedent's one-half interest in the real property located at 2454-2460 West Pico Boulevard shall be distributed to Ida Rubin, together with $2,000.00 per month until the earlier of the date of distribution or the sale of the property pursuant to the provisions of Article SEVENTH of the decedent's Will.

(d)    The decedent's one-half interest in the real property located at 2101-2117 West Pico Boulevard (1243-1247 Alvarado Boulevard) shall be distributed to Sylvia Mandel pursuant to the provisions of Article EIGHTH, Subparagraph (g) of the Will, as amended by Paragraph 2 of the decedent's Codicil.

(e)    The balance of the decedent's estate shall be distributed to Cira, or her assignee, as decedent's community property under the intestate provisions of Probate Code Section 6401(a).

2.    **Governing Law.** This Agreement shall be governed by and construed under the laws of the State of California applicable to contracts made in such state, without reference to conflicts of law principles.

3.    **Further Cooperation.** The parties hereto agree to execute and deliver such further documents or instruments and take such further actions as the parties shall reasonably request to effectuate the intent of the parties as expressed herein.

4.    **Counterpart and Facsimile/Photocopy Signatures.** This Agreement
may be signed in any number of counterparts, each of which shall be deemed an original and all of
which shall be deemed one and the same instrument. A facsimile or photocopy shall be deemed to
have the same force and effect as an original.

5.    **Deemed to be Prepared by All Parties.** In interpreting this Agreement it
shall be deemed that it was prepared by all of the parties jointly and no ambiguity shall be resolved
against any party on the premise that it or its attorneys was responsible for having drafted this
Agreement or the provision at issue.

6.    **Full Authority.** Each signatory to this Agreement represents and warrants
that he or she has the full authority and power to bind the party for whom he or she is executing
this Agreement.

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement as of
the date first set forth above.

Executor:

_____
SYLVIA MANDEL

Cira:

_____
CIRA TAPIA ROSS

Beneficiaries:

_____
ANNA YOUNG

_____
BEA SILPA

_____
MORRIS GLICKMAN

_____
IDA RUBIN

_____
LINDA PARMENTIER

_____
GLORIA KARP

F:\CALIFORNIA STATE CASES\ROSS, Yzaa\THE ESTATE OF\Distribution Agrm

Beneficiaries:

_____
DAVID L. ROSS

_____
SUSAN PARKER

_____
ESTHER RICHMOND

_____
SYLVIA MANDEL

**EXHIBIT E**

## IRREVOCABLE ASSIGNMENT

For value received I, CIRA ROSS, currently residing at 616 High Road, Palm Springs, California 92262, do irrevocably transfer and assign to CIRA ROSS, JASON RUBIN and MERRILL LYNCH COMPANY, FSB, a federally chartered savings bank, as Trustees of the Cira Ross Qualified Domestic Trust dated March 11, 2002 (the "QDOT") those assets passing to me from the estate of my deceased husband, YSAAC ROSS, on January 11, 2001, the date of his death, which are described on Exhibit 1 of this Assignment.

SYLVIA MANDEL is serving as the Administrator of the Estate of Ysaac Ross in the County of Riverside, State of California under the jurisdiction of the Riverside County Superior Court. Said Administrator agrees to transfer the assets, or the net proceeds of sale therefrom after paying any and all expenses of administration and claims, to the QDOT, and to file the United States Federal Estate Tax Return for the Estate of Ysaac Ross reflecting this Irrevocable Assignment of said assets to the QDOT

The Trustees of the QDOT agrees to accept said assets into the QDOT upon receipt from the Administrator

DATE: _3 - 11 - 2002_                     _Cira Ross_
                                          Cira Ross

DATE: _3 -11 - 2002_                      _Sylvia Mandel_
                                          Sylvia Mandel, Executor of the
                                          Ysaac Ross Estate

DATE: _3/11 2002_                         _____
                                          Jason Rubin, co-Trustee of the QDOT

DATE: _4/3 2002_                          Merrill Lynch Trust Company, FSB

                                          by _____
                                            Co-Trustee of the QDOT

**EXHIBIT F**

1  Stephan A. Mills, Esq., Bar No. 94166
   ZEMANEK & MILLS
2  A Professional Corporation
   11845 W. Olympic Boulevard, Suite 625
3  Los Angeles, California  90064-5020
   PH: 310/473-8100  FAX:  310/445-3166
4
   James D. Turner, Esq., Bar No. 72979
5  Anderholt & Turner LLP
   74-770 Highway 111, Suite 201
6  Indian Wells, CA 92210
   PH: 760/674-0998 FAX: 760/674-0925
7

8  Attorneys for Plaintiffs
   Jason Rubin and Cira Ross,
9  as Co-Trustees of the Cira
   Ross Qualified Domestic
10 Trust

11            SUPERIOR COURT OF THE STATE OF CALIFORNIA

12                     COUNTY OF RIVERSIDE

13 JASON RUBIN and CIRA ROSS,      ) CASE NO.: INC 031863
   Co-Trustees of the Cira Ross    )
14 Qualified Domestic Trust,       ) **SECOND AUGMENTED AMENDED**
                                   ) **JUDGMENT AGAINST BOTH**
15                   Plaintiff,    ) **DEFENDANTS**
                                   )
16        vs.                      )
                                   )
17 David Ross, Ross, Rose &        ) Date:  October 9, 2008
   Hammill, LLP, et al.,           ) Time:  8:30 a.m.
18                                 ) Place: Dept. "2J"
                   Defendants.     )
19 _____  ) Assigned to the Honorable Randall
                                     White
20

21      This cause came on regularly for hearing in the above-

22 entitled action on October 9, 2008 in Dept. 2J (Indio Branch) of

23 the above-entitled court.

24      A.  A default had previously been entered against defendants

25 David Ross and Ross, Rose & Hammill, LLP by virtue of an order

26 imposing terminating sanctions, which order was entered by this

27 court on January 12, 2007.

28      B.  On February 22, 2007, this court ordered, adjudged and

SECOND AUGMENTED AMENDED JUDGMENT
1

1   decreed that each of the allegations of the Plaintiffs' Second

2   Amended Complaint in the above-entitled action is deemed to be

3   true, and defendants David Ross and Ross, Rose & Hammill, LLP,

4   and each of them, are deemed to have admitted each of them;

5       C.  On February 22, 2007, this court ordered, adjudged and

6   decreed that Defendants David Ross and Ross, Rose & Hammill, LLP,

7   and each of them, shall pay to Plaintiffs, Jason Rubin and Cira

8   Ross, as Co-Trustees of the Cira Ross Qualified Domestic Trust,

9   the sum of $1,439,178.00 (One Million Four Hundred Thirty-Nine

10  Thousand One Hundred Seventy-Eight Dollars);

11      D.  On July 18, 2007, this court ordered, adjudged and

12  decreed, pursuant to an Amended Judgment Against Both Defendants

13  entered on said date, that, in addition to the $1,439,178.00 sum

14  specified in the preceding paragraph, defendants David Ross and

15  Ross, Rose & Hammill, LLP, and each of them, shall pay to

16  Plaintiffs Jason Rubin and Cira Ross, as Co-Trustees of the Cira

17  Ross Qualified Domestic Trust, as said Plaintiffs' costs of suit

18  (including, but not limited to, attorney's fees), the sum of

19  $304,957.04 (Three Hundred Four Thousand Nine Hundred Fifty-Seven

20  Dollars and Four Cents);

21      E.  Defendant Ross, Rose & Hammill, LLP failed to appear for

22  a duly noticed judgment debtor examination on June 5, 2007

23  without good cause.  Accordingly, on June 5, 2007, pursuant to

24  Code of Civil Procedure Section 708.170(a)(2), this court

25  ordered, adjudged and decreed that the principal amount of the

26  instant judgment was increased, with respect to defendant Ross,

27  Rose & Hammill, LLP (but not with respect to defendant David

28  Ross), by the sum of $2,400.00 (Two Thousand Four Hundred Dollars

SECOND AUGMENTED AMENDED JUDGMENT
2

050

1  and No Cents).

2      F.   On March 11, 2008, pursuant to the Court of Appeal's

3  denial of defendants' second appeal (E040545) regarding monetary

4  and evidentiary discovery sanctions, the court awarded costs

5  (including, but not limited to, attorney's fees) to Plaintiffs in

6  the sum of $16,073.27 and augmented the Amended Judgment to

7  include said sum (the resulting judgment will be referred to

8  herein as the "Augmented Amended Judgment").  The Augmented

9  Amended Judgment amounts to $1,760,208.31 with respect to

10 defendant David Ross and amounts to $1,746,535.04 with respect to

11 defendant Ross, Rose & Hammill, LLP, excluding accrued interest

12 at the legal rate.

13     G.   On October 9, 2008, pursuant to the Court of Appeal's

14 denial of defendants' third appeal (E043086), the court awarded

15 attorney's fees to Plaintiffs in the sum of $39,780.00

16 and ruled that the Augmented Revised Judgment shall be augmented,

17 with respect to defendant David Ross, to include said sum and the

18 costs claimed by Plaintiffs pursuant to a Memorandum of Costs

19 filed on August 7, 2008 (in the sum of $2,565.22).

20     **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that:

21     1.   In addition to the $1,439,178.00 sum specified above in

22 Paragraph C, in addition to the $304,957.04 sum specified above

23 in Paragraph D, and in addition to the $16,073.27 sum specified

24 above in Paragraph F, defendant David Ross shall pay to

25 Plaintiffs Jason Rubin and Cira Ross, as Co-Trustees of the Cira

26 Ross Qualified Domestic Trust, as said Plaintiffs' costs

27 (including, but not limited to, attorney's fees) with respect to

28 the appeal defendants initiated in the Fourth Appellate District,

**SECOND AUGMENTED AMENDED JUDGMENT**
3

1  Division Two (No. E043086), the sum of $42,345.22 (Forty-Two

2  Thousand Three Hundred Forty-Five Dollars and Twenty-Two Cents).

3

4  Dated: October 9, 2008

5                                    The Honorable Randall White
                                     Judge of the Superior Court
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AUGMENTED AMENDED JUDGMENT
4

052

**EXHIBIT G**







# FAST STEP SMALL BUSINESS BANKING AGREEMENT AND DISCLOSURE STATEMENT

## BY SIGNING THE FAST STEP BUSINESS CREDIT APPLICATION OR THE LINE AND/OR FEE AGREEMENT INCLUDED BELOW, YOU AGREE TO THE TERMS AND CONDITIONS OF THIS AGREEMENT AND DISCLOSURE STATEMENT.

**1. Promise to Pay.** At the time indicated below, you promise to pay to Union Bank of California, N.A. ("Bank"), or order, the full amount of all credit outstanding (including any amounts disbursed on your Line of Credit and/or Term Loan, as described below in the "Provisions Concerning Your Credit Line" and "Provisions Concerning Your Term Loan" sections, plus any interest and other charges due under this Agreement, and any taxes, insurance, or other assessments we may be required to establish, perfect, protect or enforce our security interest relating to any property given as collateral hereunder. You also promise to pay all collection costs, including court costs, including, but not limited to those incurred in authorization, trial costs, and (at the Bank's option) attorneys' fees, and the costs to Bank of any service of the summons and the costs to Bank that are to be incurred in collecting this Agreement.

## PROVISIONS CONCERNING YOUR TERM LOAN

**2. Term Loan.** The Interest rate for your Term Loan shall be set forth in the Welcome Letter, calculated on the basis of a 365 day year. You agree that the interest rate is conditioned upon payments being made by automatic deduction (PIN) from a designated Union Bank of California checking or savings account ("Account").

**3. Statement.** The Bank will send, to your most recent address shown on its records, a statement of the account. The statement will be made monthly. The period covered by each statement and the balance on your Account. If you have any dispute concerning the statement, you must notify the Bank in writing at the address shown on your monthly statement within 15 days of the statement mailing date, after which time the statement will be considered correct.

## PROVISIONS CONCERNING YOUR CREDIT LINE

**5. Credit Line.** The principal balance outstanding on your Line is subtracted by the amount of credit available on your Line of Credit is reduced by the amount of the principal balance and accrued but unpaid interest. The amount of credit available from time to time on your Line (or your Line, plus any interest and other charges) will be due and repaid on your Line of Credit. You may increase the amount of the credit available on your Line (or your Line, plus any interest and other charges) will be due and repaid on your Line from time to time during the term of this Agreement, subject to the limitations of your Line for a period determined by Bank at each billing date. In no event is the Bank required to renew your Line, however.

**6. Line Access.**

**Quick Access.** After your Line is opened, the Bank will provide you with Line of Credit Checks ("Checks"). You promise that you will not generate a check drawn on your Line unless you have sufficient credit to use your Line. Checks are not returned to you, however, you may obtain copies of Checks subject to payment of a fee. If you place a stop payment on a check issued by you under the line in accordance with the terms, and Bank may dishonor the check subject to that request each.

**About Business Accounts & Services.** If you previously were not you, in most cases, the Bank may pay checks and items presented even if the account has insufficient funds. Bank has no responsibility to make any periodic transaction on any other check or money check drawn by you. If your checks become lost or stolen, you agree to notify the Bank at once at the address or telephone number shown on your monthly billing statement. Only one signature shall be required on any check.

**Telephone or PC Access.** You may sign up to permit telephone or through other software in a personal form. The Bank will issue a Personal Identification Number (PIN) and then transactions will be processed by the terms of this Agreement, your Online Service Agreement and other related terms. You agree to indemnify, defend and hold harmless the Bank from and against all liability, loss and costs in connection with any activity arising from telephone instructions which Bank receives purporting to be made by any individual authorized by you to give such instructions. This indemnity shall survive termination of this Agreement.

## PROVISIONS CONCERNING YOUR CREDIT LINE

**5.** Credit Line, the amount of your Line is advances will be in an amount of at least $500. The Bank may amount of credit available on your Line is reduced by the amount of the principal balance and accrued but unpaid interest. The amount shown on its records, a statement for each monthly billing period, on which your Line has a balance. If you have any dispute concerning the statement, you must notify the Bank in writing at the address shown on your monthly statement within 15 days of the statement mailing date, after which time the statement will be considered correct.

**7. Interest Rate, Daily Periodic Interest Rate.** The interest rate for the Line of Line or other offer on the first day of each calendar month. The interest rate is the variable rate index which Bank may choose (the highest prime rate. If the interest rate is published in the "Money Rates" section of the Wall Street Journal, in the West Coast Edition, then in another newspaper of general circulation, or other publication as Bank may in its sole discretion. The daily periodic rate is published in a similar reference rate at its sole discretion. The daily periodic rate is the interest rate on your Line divided by 100 divided by 365. You agree that the interest rate is conditioned upon payments being made by automatic deduction (PIN) from a designated Union Bank of California checking or savings Account. All advances and total debits to your Line of credit and excluding any other finance charges or late payment charges from the date each advance, are subject to interest charges. Your periodic interest charge is computed by multiplying the outstanding balance of your Line each day of the billing period, and adding these charges of your Line for all days in any the billing period. The outstanding balance for each day is determined by adding the beginning balance for that day of payments and credits, and on the day of payments and other credits, and adding the amount of any advances or other debits. Your monthly periodic interest charge for the monthly billing period.

**9. Payments.** You agree to pay at your least the amount set forth below, under the Line, you agree to pay at least the minimum payment shown on your statement. Your minimum payment will be the sum of (i) any finance charge as shown on the billing period, plus (ii) the amount of interest charge, and (iii) any late charges and/or other expenses incurred thereof (the "Shortfall"). In addition, your payment shall be either the sum of (i), (ii) and (iii) or the amount of $100 and (iii) is not renewed at the expiration of your Line, the entire unpaid balance of your Line, including principal and interest, will be due and deducted from your Account.

any prepayment of principal or interest at any periodic or advance. Certain outstanding fees, late charges, out-of-pocket or miscellaneous interest and, in the event your advance, your Line is cancelled will not be...

**10. Cancellation and Suspension.** The Bank may, at its option, cancel or suspend your Line for you on the Bank's records. If your Line is cancelled, this will be an advance notice of cancellation need be given to you or collateral on the Line. Any such notice is given of such cancellation. Checks written on your Line after your Line is cancelled will not be paid by the Bank.

## OTHER PROVISIONS

**11. Automatic Deduction.** You agree that such fees, Line charges, interest, and principal to your Credit, late charges, interest, and other amounts due subject to periodic amounts will be charged to your Credit, principal to this Credit, proceeded so to. Alternatively, payments may be obtained from the Credit. All fees on your one-out-of-pocket expenses incurred by your Account to defend for any reason, or if the Account funds are insufficient, you may be required to pay. The Bank may also charge your Account for any reason, or if the Account funds are insufficient, you may be required to pay. The Bank may also increase the maximum liability and the applicable percentage points. The Bank may also charge your Account for any renewal.

**12. Fees.** You agree to pay a loan fee and other disclosed to you separately. Certain out-of-pocket fees may also be assessed to activate your Credit, subject to periodic charges, interest, and other periodic amount will be charged to your Credit.

**13. Late Payments.** If your Credit was establish in California or Washington, and if the Bank receives more than 10 days after the due date shown on a statement, you agree to pay a fee of 5% of the (i) than, or $100, whichever is greater. If your Credit is established in Oregon, if the Bank receives a payment more than 10 days after the date shown on your statement, you agree to pay a fee of 5% of the amount past...

| In re: Jason Rubin v. David Leonard Ross | CHAPTER: 7 |
|---|---|
| Debtor(s). | CASE NUMBER: 2:09-02063-SB |

**NOTE**: When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on a CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
206 N. Jackson Street, Suite 201
Glendale, CA 91206

A true and correct copy of the foregoing document described as  1st Amended Complaint
_____ will be served or was
served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d), and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** - Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On  11/13/09_____  I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email addressed indicated below:
* Scott C Clarkson    sclarkson@lawcgm.com
* David A Tilem    davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;marcycarman@tilemlaw.com
* United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):
On  11/3/09_____  I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follow. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☑ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method) by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 11/13/09 | Malissa Murguia | *Malissa Murguia* |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009

**F 9013-3.1**

| In re: Jason Rubin v. David Leonard Ross | CHAPTER: 7 |
| Debtor(s). | CASE NUMBER: 2:09-02063-SB |

**ADDITIONAL SERVICE INFORMATION (if needed):**

Scott Clarkson
Clarkson Gore & Marsella APLC
3424 Carson Street, Suite 350
Torrance, CA 90503

Steve Mills
Zemanek & Mills
11845 W. Olympic Blvd. #625
Los Angeles, CA 90064

Honorable Samuel L. Bufford
United States Bankruptcy Court
255 E. Temple Street, Suite 1582
Los Angeles, CA 90012

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                                          **F 9013-3.1**